Our final case this morning is 23-4572, United States v. Bolling. Mr. Yost. May it please the Court, Honorable Justices, my name is Brian Yost and I'm here today representing the appellant and defendant below, Mark Bolling. This is a case that began back in September of 2020 when Patrolman Farley, a 20-year-old with one-year experience on the police force, was monitoring traffic on Interstate US 19 in Fayetteville, West Virginia. Also that night there was another individual there by the name of Deputy Gerritsen who was also monitoring traffic at the same time, and two vehicles were pulled over. Farley happened to pull over a vehicle driven by Mr. Bolling. Once he pulled him over, he advised him that he clocked him going 68 miles per hour. Of course, we haven't challenged the stop itself, but he asked for the driver's license registration and insurance information. He claims Mr. Bolling was unable to provide him his driver's license. Mr. Bolling testified that he did in fact provide his driver's license. And the district court believed who? And the district court believed Officer Farley. He found that Officer Farley was credible on that issue. However, the CAD report, I would note, there's clear evidence in the CAD report that one hour and 15 minutes . . . Do you challenge that finding is clearly erroneous? Yes, I would say it is clearly erroneous. The finding that was refuted in the CAD report, and on cross-examination, Officer Farley, when confronted with the CAD report that showed that the license number was wrong, not Mr. Bolling's name at that time, he stated then, I don't remember receiving the license at the beginning of the stop. But in any event, he did not provide the registration and the proof of insurance. That is accurate. Mr. Bolling apparently told him that it was in the car. He didn't want to look for it in the middle of the night. But nonetheless, at the time of the stop, he ran the license plate and the registration information came back immediately, within three minutes. The stop was at 2.52 in the morning and at 2.55, he had the registration information on the vehicle, showing that it was a rental car and that it was an enterprise rental car from EAN Holdings. So, he would have had that information if he had just continued following the purposes of the stop, which he didn't do. He immediately, upon stopping the vehicle, he had Mr. Bolling step out of the vehicle, took him to the back. And the next thing he did was ran the information on the backseat passenger. He did nothing with Mr. Bolling's information, but he took a backseat passenger, a Samuel Burdett, he ran that information to check to see if he had any warrants out for him and just did an ID check. And it came back that he had an expired ID and there were no warrants on him. That completed everything related to the actual stop without ever running any information on Mr. Bolling or on the frontseat passenger, Mr. Smith. He just then moved on. After getting this information back, eight minutes into the stop, about 3 o'clock, he knows that there's no outstanding warrants. He just begins questioning Mr. Bolling at the back of the car. And he decides at some point he's going to get a K-9. So, he starts trying to get a K-9. At 3-12, he calls. Now, this is... At what point did he notice that there was a problem with the cover and the steering wheel? He testified that he noticed that there was a problem with the steering wheel immediately. What are we to make of that? Is that heightened suspicion? I don't believe that's heightened suspicion. I don't think it's... Look. Really bizarre. Well, it's odd, but airbags deploy. I just recently had an airbag deploy in my vehicle in an accident. That's not unusual for an airbag to deploy. And then it's just hanging there and cut out. I've seen vehicles with that. I don't believe that is necessarily any indication that there's criminal activity going on, that an airbag had been deployed. It's just an indication that at some point there had been a collision.  Huh? Wasn't the airbag cut out of this? Not just that it was hanging there. It was cut out. No, yeah. It was cut out. That's what I'm saying. It wouldn't be unusual to cut it out because otherwise the airbag just hangs there. But I guess what that does suggest is it didn't just happen, most likely, right? I mean, it'd be one thing if it's just hanging there. Like, maybe it happened 10 minutes ago. Maybe it happened this morning. Maybe I'm deriving it to the mechanic. But the fact that it's cut out suggests that it didn't just happen.  Yeah, that is true. But I don't think it is any indication of some kind of criminal activity that's taking place. Well, but the fact that it's a rental car just adds sort of to the mystery, right? Because you'd think a rental car would assume a rental car wouldn't rent a rental with the airbag missing. So something happened. You would assume that, correct. Now, he didn't connect the two, apparently, at the beginning because he claims he didn't find out it was a rental car until later because he didn't check the information that came back. But that information was available to him. I don't mean to interrupt the flow of your events, but let's assume that I, and I'm speaking for myself, agree that this officer just went beyond the purpose of the stop, which was a traffic infraction, and you have persuaded me that there was a constitutional violation. The problem that I have in this case is that there was evidence and testimony that this officer intended to tow the car because of the lack of, at least the lack of insurance and perhaps the lack of a driver's license. And there was evidence from his superior that suggests that that was a policy of the law enforcement agency. And if we credit that evidence, then wouldn't this contraband that was found in the car, regardless of the violation, have been inevitably discovered? I don't believe so. I don't think the court ultimately did not decide this was an inevitable discovery. I'm not sure that we can affirm on any ground. I understand, Your Honor. Why isn't that a ground on which to affirm? Okay, well, first of all, the government didn't produce any information whatsoever to verify this idea that he ever intended to tow the vehicle initially. This is the first time, the first time that information came up was at the suppression hearing. There was nothing in the record that indicated that he was going to tow the vehicle because of that. In fact, the reason he indicates in his police report is he, when he was confronted with it, was because of the nervousness of Mr. Bowling. He decided to get the people out of the car. Didn't the district court make a finding that, in fact, the officer intended to tow it? He didn't say, the district court just didn't say that would have inevitably led to the discovery of the contraband, but said that was a basis for extending the stop. Well, I mean, the court in their conclusion indicated that there were, the reasonable suspicion that gave rise was, they, the court referred to that as well, but he ultimately said that there was reasonable suspicion. Sure, but to pick up what the chief said, the court made a factual determination that it was the policy of this police department to tow all vehicles, did it not? He acknowledged that that testimony was. He made a factual determination? Well, yeah, I guess you could say that this individual testified to that. However, that would be contrary. Is that factual determination clearly erroneous? It is because that. How? The officer testified to it? His supervisor testified to it? How is it possibly clearly erroneous to credit the testimony of the officer and his supervisor? Because that is not the intent of the law in West Virginia with regard to a certificate of insurance. Let's posit that I believe you that West Virginia law would not have required the vehicle to be towed. I think maybe you have a plausible reading that West Virginia law does not require towing in this situation, but that's different from whether Fayetteville has a policy of towing vehicles in this situation. I think it's more than that in terms of whether or not the policy, what he testified to, it is a policy to tow a vehicle without insurance. West Virginia has a law that requires you to carry a piece of paper in the vehicle that is a certificate of insurance. The presence or absence of that certificate of insurance is not necessarily an indication that you do not have insurance. If you don't have that certificate, in several different contexts, the law provides you have an opportunity to bring the certificate in, whether it is to a court hearing or to a court. You have the opportunity to produce it to defend against a criminal charge. That makes sense. But the flip side is you agree that it is illegal to operate a vehicle in West Virginia without insurance, right? It is. Okay. So I pull over a car and I say, do you have your insurance? And the person says, no, I don't. And now the officer says, well, now I don't know if I let you drive away. You're going to be operating a vehicle without insurance. Now, of course, you're going to tell me you have insurance. But with all due respect, people tell police officers things that aren't true literally all the time. So a police officer doesn't have to take your client's uncorroborated word that he has insurance. So the officer says, well, given that you don't have insurance and given that it's illegal to operate a vehicle without insurance, I can't let you drive this vehicle away because I don't currently know whether you have insurance. But he never made a determination that he didn't have insurance. He made a determination that there was no certificate of insurance. He received back that he ignored. He received back when he called the registration in, he received back information that this was a rental car. It was an enterprise rental car. The rental car companies are required to maintain insurance in the state of West Virginia on the vehicles. And they do. There's no requirement that an individual renting a car has to, legal requirement that an individual renting a car has to maintain separate insurance. Now, they won't rent it to you, likely, unless you do. But that's the rental company's decision. But they insure the vehicle. So there is insurance on this vehicle. The question is, did he have proof of the insurance? And that is the four corners of what's happening in this particular case. I think you did the retention of the phone issue because I have some questions about that. Okay. Did your client ever ask for the phone back? Well, my client, my understanding. Did he or anyone on his behalf ever ask for the phone back? I will represent to the court. I did not represent him initially. And I have no information that his prior counsel made such a request. And he was incarcerated. He did not make one directly. And I presume you agree that the government does not have to and, in fact, probably can't give a phone back to someone who's incarcerated. I agree with that. So what was the government supposed to do with this phone? Well, I'm just. I think in the end, ultimately, with the court's decision in this particular case, I think this phone argument goes more to my due process argument. And I would acknowledge that under the circumstances, he did not ask for the phone back. And I have no. I cannot represent to the court otherwise. I don't know what actually happened with his other attorney. But I have no information, independent knowledge, that that was ever requested from the police. But they did hold on to this. And the manner in which they obtained the search warrant on that phone was outrageous. I mean, they have all this false information. These are flat-out lies. They can say what they want about clerical errors. These are lies. On the first one, I assert that they were lies that they knew or should have known were untrue about the premises that they were searching. When they submitted a search warrant for the cell phone the first time, they included all the same information, all the same lies that enhanced the appearance of the necessity of the search warrant and to raise probable cause. They say it didn't go to the. Without it, they could have had it nonetheless, got the search warrant nonetheless, had probable cause. But why did you put it in there? So let's say we, what you said, lies regarding the search, I guess, of the things, the search of the house. Of 117 Keystone Drive. Yeah, how many people were living there and all of that. If that's all deleted, would they still have probable cause for the search of the phone? Considering the phone was in the car, the phone was recovered from the car. Correct. I mean, I can't say, you know, the magistrate may have determined that there was probable cause with that. He may not have. I don't know. I don't know what the magistrate would have, what decision he would have made if they left all that information out with regard to the phone. But nonetheless, it still goes to the conduct of the law enforcement in this particular case, the lies on that affidavit. Now, on the third, they did the same thing. Once again, they include false information on an affidavit. This is consistent with what's been happening throughout this case from the very beginning with withholding of evidence and delay in producing evidence. They withheld, there was a poll cam. I didn't know that there was a poll cam present until in October of 2022, just prior to a scheduled trial. This is the first time it came out, and it came out because of some notes from the ATF that indicated there was a poll cam. This was not on the U.S. Attorney's Office. I spoke with the U.S. Attorney's. This is information that the U.S. Attorney's Office was not receiving. And he looked into it and said, well, there was a poll cam, but it didn't record anything. Well, it turns out it did record stuff because Agent Bullard testified that he reviewed information on there, and initially I determined that it was recording something because in his search warrant affidavit, he had a picture that was obviously taken from that poll cam. So he didn't produce the poll cam. That was pointed right at the area where Mr. Jordan's apartment is where the guns were found. No guns were found on Mr. Bowling. No guns were found in his apartment. Everything was found in Mr. Jordan's apartment, what you have to go through the parking lot. It would have showed anybody coming and going from that, including Mr. Bowling. There was only one way in. That would have been evidence that we could have used to show either somebody carrying it in or Mr. Bowling not. There was also a DVR that they got from a neighbor that had a security camera pointed right at Mr. outside their house, which is pointing directly at Mr. Bowling's. May I continue? Your time is up. You've got some rebuttal.  Thank you very much. I would just note that the actions of law enforcement are atrocious in terms of the due process argument as well. Thank you. Ms. Harreld? Thank you, Your Honor. May it please the court, Jennifer Harreld on behalf of the United States. This court should affirm the defendant's conviction. The court did not clearly err in any of the factual findings or misapply the law regarding the defendant's motions to suppress. He properly denied a Franks hearing and in reality held a Franks hearing in order to determine that he should not have had a Franks hearing. There was no abuse of discretion in denying the motion to strike the juror for cause. There was sufficient evidence to find constructive possession at the end of trial. And he properly found that the staleness argument regarding the phone was insufficient to suppress it. Ms. Harreld, can I just – you're a lawyer who represents people and you're not responsible for all the things they do. I was in your position or an analogous one at one point. I hope something very bad happens to a person who submitted repeatedly false statements to a court and got a search warrant based on them. I just deeply hope and assume that severe consequences have been taken as a result of literally saying things in affidavits that were flat out false. So I was not counsel on the underlying case, so I don't know exactly what repercussions may have happened. But to be perfectly frank, I agree with you, Your Honor. These search warrants – I would never have submitted a search warrant with this kind of information. It was exceptionally sloppy, cutting and pasting orders. That is the very most generous description. But the court was correct in denying motions to suppress. With regard to the residential search, the information was based off of the information that Special Agent Bullard had at the time from a C.I. He had taken steps to try to confirm whether there were other individuals residing in the home. And the court credited his testimony. Can I just go back so conceptually? I felt I needed to say that because until I said that, I was not going to think about anything else during your argument. But can we go back to the prolonged – so the unnecessary prolonged. So here's what feels to me like a critical question in the district court. So the district court's idea, and maybe – especially the way the district court thought of this, which is the stop wasn't unnecessarily prolonged because we had to wait for the tow truck. There was no tow truck. Does that not necessarily entail that if at some point during the stop Mr. Bowling had said the following, I understand that you're not going to let me drive away because I don't have my insurance, but I'm going to call my friend and ask him to come pick me up, and I'm going to leave. On the district court's theory, the officers would have had to let him leave, right? Yes, Your Honor. Because if the only reason to keep this all going is we've got to tow the car, if Mr. Bowling wants to peace out, Mr. Bowling can just peace out. Yes, that was the finding of the court. Do we think that is a plausible interpretation that the officer was actually going to let Mr. Bowling peace out, even if he tried to? It's hard to know what the officer would have done. This was – As a descriptive matter about the world, it strikes me as extraordinarily unlikely that this officer was going to let Mr. Bowling just leave. It probably was, and I think that's in light of the remaining circumstances because he also – the towing issue was one issue. He also had reasonable suspicion at that time, and I think if Mr. Bowling had said, hey, I'd like to call someone to come pick me up, at that point, the officer thought he had reasonable suspicion. The district court found that he did, in fact, have reasonable suspicion. I think he would have done that search prior to letting him go. Can we – can you – so, okay, let me pause on this. I definitely agree there are facts that suggest weirdness. We talked about that. I guess the link I'm missing is I definitely see facts that something is kind of weird. I'm not sure I – like, what crime is there reasonable suspicion of, right? I really – I'm really struggling. Like, we've got a few circumstances. I agree they seem a little strange, but I literally have been mentally trying to figure out what crime do these make me think is going on, and I am, candidly, having trouble. And that is one thing with reasonable suspicion. Usually you don't know what the crime is. It's not reasonable suspicion of weirdness, though. We don't allow you to keep people on the side of the road for half an hour because of reasonable – like, okay, so let's take the classic case, Terry v. Ohio, right? So Terry v. Ohio, think about the officer testifies in Terry. Think about the Supreme Court says, like, this seems like these guys might be casing the joint. Do I know they're casing the joint? No. Do I even necessarily have probable cause? No. But, like, this pattern of weird behavior I observe leads to a fairly confined number of hypotheses of things that are identifiable crimes, and I think when I think – I think most Terry cases that I'm aware of are like that, right? Like, maybe these people are drug dealing. Maybe these people are this. I don't know what crime this creates reasonable suspicion of. And it's not in the record, Your Honor. The court didn't require this further information, but in this – Well, I don't think the officer didn't identify a particular crime either. He just thought things were weird, suspicious, but he didn't articulate what the suspicion was. He didn't articulate – he articulated many different possibilities. But in this particular location, there is often drug trafficking, and when he said that the route that was being taken was unusual, I'm sure he wasn't just saying, oh, this is – you know, obviously someone would have driven the other way. He said driving on a more rural route is a frequent habit of individuals who are trafficking drugs. Now, that's not in the record, but that is in the back of the officer's mind. It doesn't make it unreasonable that one of the things that he was thinking could be at issue was drug trafficking, and he mentioned that as one of his several things he was concerned about. So is this – are a lot of these things weird? Yes. The airbag in a rental car being cut out. As Chief Judge Diaz pointed out, Enterprise is not renting cars with airbags cut out, and if I've rented a car and I'm in a car accident, I'm not going to cut it out and just keep driving it around. I'm going to go get a new rental car. So those are suspicious things. In fact, that would be suspicious information that perhaps – Suspicious of what, though? They got in a car accident? And didn't report it to the Enterprise rental company. Maybe as a breach of contract, but it's not a crime. They probably also did not report it in that – under the circumstances to law enforcement, because law enforcement probably would have – A crime to not report a car accident to law enforcement? If there's property damage. Can I ask you about a factual question that is just confusing the heck out of me? How do you explain Officer Farley running his learner's permit number over an hour into the stop when he allegedly never received a license? Well, the court credited his testimony that he did not receive it. With all due respect to the district court, I don't know how to square that factual finding with the fact that he ran the learner's permit number. He ran the learner's permit. Where did he get it if he didn't get it from the license? At that point in time, they had placed the defendant under arrest and likely searched him incident to that arrest. They had searched the vehicle. This was two years later, and Officer Farley did not remember how he got it. He knew he didn't have it at the front end. He could have easily found it during that search. If it was present on the person of the defendant or in the vehicle, it would have been found. And so given the timing of when that was done, after a search had been completed, after the defendant had been placed under arrest, there were a number of reasonable conclusions as to how he obtained the learner's permit up front. And when you think about the way he conducted this, he said, I asked him for his information. He did not provide it to me. I got him out of the car. We began talking. He gave me the name of the backseat passenger, so I radioed in that name. So right now he has a person who's refusing to give him identification. He might not trust that particular name if Mr. Boland gave him the name. There's actually no testimony on the record as to whether he even stated his name. He does get a name, and he runs it for someone in the backseat. So none of that is an unreasonable action or course of action to take. It's not indication that he was nefariously trying to extend the stop by refusing to call in information. When he got information, he appeared to be calling it in. And under the circumstances, in this case with the traffic stop, there's really four different grounds to affirm based upon the conclusions, the factual findings of the district court. The defendant testified at the hearing he never turned over insurance information. The court credited that he had not turned over his driver's license. Until those things are done, until this officer can confirm that the defendant can legally operate this vehicle and that insurance covers this individual. Did he turn over the rental car information? He did not, Your Honor. He said it was a rental. He did not turn over any certification or any rental agreement to authorize him. And in fact, if he had, he was not the person named on that rental agreement. But that rental agreement was not turned over. So then maybe he's in violation of a contract with Enterprise, right? I think I can make a statement about the world that people frequently drive rental cars that they're not on their rental agreement for. Would you agree that's probably true? I would agree that that is probably true, Your Honor. And that it's not a crime? It might be a breach of my agreement with Enterprise, but it's not a crime to do that? No, it is not a crime to do that. However, it's a very good likelihood that that would violate the insurance agreement between Enterprise. Enterprise's insurance is likely not going to cover non-authorized drivers. A guy with a learner's permit? A person with a learner's permit. I believe there's testimony that someone with a learner's permit would not be legally able to operate a vehicle at 3 a.m. because there is a curfew in place. The officer believed it was 10 or 11 p.m. And having driven in West Virginia with a learner's permit, I can tell you that that's true. Can I at some point, can I take you to the phone? Because I just have a conceptual question with the government's argument. Is it your view that a person who's incarcerated retains no possessory interest whatsoever in the property that was taken before their incarceration? Because that's, I mean, look, as I said to your friend on the other side, I totally agree that when he's incarcerated, we can't give him the phone. But it also seems weird that he has no possessory interest in the phone either. And I think that's fair to say that it's not zero. It's very minimal. Of course, if found, it's very minimal. And there is a circumstance. And as your Honor asked, he could call his wife and ask her to go get it. That would be him having some kind of possessory interest to discuss where the phone ended up. That never happened. He was too busy calling his wife for other things. Yes, your Honor. In fact, he called her to delete the phone. We could reject his claim here without saying what we would say if at some point during that lengthy period, he, his wife, his authorized agent had said, I would like the phone back. We could leave open what would have had to happen then. I believe so, your Honor. We don't need to reach that because it didn't happen. So that is a different case for a different day. But also in this case, when you look at Pratt, there were two issues. It was the possessory interest was not diminished for Mr. Pratt. But also, there was no reason, good reason given for the delay. They were trying to pick which state they wanted to get a search warrant in. That's not a justified response. This is a situation where the government promptly obtained a search warrant. And the technology was not available for them to search that. But they still had a strong interest in searching this phone. They knew this phone was seized from someone who also had substantial quantities of meth and fentanyl. This may or may not be in the record, but is this the situation, could you have cloned the phone, even if you couldn't unlock the phone, could you have cloned the phone during this period of time? I do a lot of phone cases, your Honor. This isn't in the record, but no. The problem is you cannot, until the software is updated, they cannot even extract the phone. And they can try code breakers. Those often can take months because it is just a random selection. So I have often had cases where we've had to wait for an update. Pratt said that, too, right? Or we have cases that say, like, to the extent the government has an interest, they have an interest in the info. They don't have an interest in the phone. So if you can just clone the info, you can then give the phone back. Yes. And we are in a situation where we could not take that step. You could not clone the phone or extract it to create a mirror image. Is there a limit as to how long the government could have held the phone waiting for the software update? I think if the defendant had been released on bond and had a possessory interest, that could come into play. I mean, you just can't sit on it indefinitely. I mean, there's got to be some limit to that, I would think. And when you think about, if the government has a reasonable, they have a good justification for keeping it. Their interest in the information on the phone is not diminishing over time. And the statute of limitations is, frankly, something that Congress has said, this is when you stop. And I think the statute of limitations to charge the crime was running. You obviously can't hold it past that. I think if he had gotten out and had his possessory interest available, that would counterbalance it, potentially. But that justification for needing the phone in the first place and having a government interest, a strong government interest in that information, isn't diminishing over time. So I don't think there is a time limit you can put on there when the government does have a reason, a reasonable interest in maintaining the phone. On the phone, I asked him this question earlier. So, with the issues with the search warrant, I think we all kind of acknowledged the issues with the search warrant. Do you still believe, tell me why are governments of this argument that there's still probable cause on the search warrant of the phone, the last search warrant? There is, really, the false information, it didn't need to be updated. It could have just been taken out. Because the phone could have been searched. They could have gotten a search warrant for that phone the day that they obtained it, in the car, in the traffic stop, which was before and unrelated to the search of the home. Based on the contraband that was found in the car? Yes. There's drugs, there's cash, there's a phone. And the search warrant affidavit articulated the connection between drugs, cash, and cell phones and how those are used in drug trafficking. So, if you had confined it to the universe of that, you could have gotten a search warrant. The information about the CI doing the controlled buy just further adds to that. But even that would not have been necessary. That supports the inference that the defendant is not just some guy in a car that's got drugs. Yes. And that the drugs were... Someone else's. To be distributed. I think those quantities are not going to be personal use quantities. Those two pieces of information were accurate. You take out everything else that was admittedly very sloppily included, you still have probable cause. So, the search of the phone would have been valid, and I think the court was correct in making that determination, that there was sufficient probable cause, and I would ask that this court agree with that. If the court has no further questions... One more question. The gun in the trunk of the Camry, I think there's an argument regarding its constructive possession of that. What do you have that, I guess, in terms of evidence that links them to the gun? The gun in the Camry was not the basis of any of the charges. It was, and that charge was dismissed by the United States, so it was solely 404B evidence. And for purposes of that, you know, is there sufficient evidence to have connected the Camry to a conviction? It would be less strong than the evidence of the guns that were found in Mr. Jordan's apartment, but that was not the basis of a conviction. Thank you, Ms. Harreld. Thank you, Your Honors. With this search, I want to touch on another issue with this search warrant idea and reason that maybe it's kind of sloppy, and I think it's worse than sloppy. I think that it goes beyond that, and somebody should be held accountable, and I think they should be held accountable in this case. During the trial, it was determined that, or during the hearing, the suppression hearing, this late supplied exit video was significant because at the end of the exit video, they said this search is complete, 1649. Bullard testified that this search took about an hour and a half to perform, that he got over there about three. In this search warrant, he testified that he included jail calls. I mean, it's undisputed. I mean, he included jail calls in there. He had the email. We had the email where he got the jail calls. Those were after 3 o'clock in the afternoon, and I detailed this in my brief, but I think it's very important. It becomes clear because of the exit video and the time of the exit video, and what he testified he did. He got these jail calls. He listened to the jail calls. He drafted the search warrant. He sent the search warrant to the U.S. attorney who sent it to the magistrate. The magistrate issued the affidavit, the application. The warrant was issued, sent back to the U.S. attorney, and sent to Bullard, who then claims that he conducted this search, receiving these jail calls, after 3.30 in the afternoon. He was done at 4.30 on an hour and a half search. The evidence in this case establishes that he had to have begun this search before he had a search warrant. This whole thing stinks with the search warrant. This false information was included in this affidavit because they knew exactly. It was perfectly clear that this was a four-bedroom apartment, and he lived in one apartment or his other ones, but they apply for a search warrant for everything so they can search everything, knowing full well that I'm going to have standing issues if they find something in one of these other apartments. I can't attack it. So they get a search warrant. They go in, and they search the whole building. They find information, or they find contraband in one of the apartments, and their argument is, well, you can't attack this. Well, they used false information to get the search warrant. They probably started the search before the search warrant, well, obviously they started the search before they had the actual search warrant in hand because it's impossible in the time that was listed for him to do all those things and conduct the search. They didn't provide me with the video. They withheld the video of the search. They gave me the exit video. The other video would have absolutely confirmed this, that this search began before he had the search warrant. I asked if there was one. He said, yes. I said, where is it? I don't know where it is. So they didn't produce that. Everything in this case stinks from the very beginning. With regard to the route he was taking, I want to say something. There was an argument made that taking a more rural route is what drug dealers do. That's not what he was doing. He was taking the less rural route. That's why Farley thought it was a problem, because there was a shorter route getting off 19 going up a two-lane road up Route 60 in the middle of the night. He could have gone back to Charleston that way. What he was doing was headed directly to the interstate, the West Virginia Turnpike, and if you Google it, it's the shorter route Farley referred to. Granted, time-wise, it's the same distance. So he wasn't taking a more rural route. He was on a U.S. highway, driving down a U.S. highway at this time. The timing on the learner's permit, at no time did he ever say that that was recovered in a search. He said, it wasn't given to me. He was confronted with it. He could have explained it away, and he didn't say that. He said, oh, I don't remember receiving it at the beginning. But he had it, and he ran it, and, you know, he couldn't articulate a reasonable suspicion when asked about it. He said there could have been bodies, there could have been drugs, there could have been anything in here. He was unable to articulate any kind of a reasonable suspicion. I think all of the findings that the court made where they found that he had a reasonable suspicion are simply, you know, unusual incidents. The car speeding at 3 a.m. There were two officers on this highway at this time of the morning. It's a pretty heavily traveled road. The fact that he's speeding, okay, he was breaking the speed limit. That's not unusual. We discussed the driver's license registration and proof of insurance, the hole in the steering wheel. I don't deny that these facts occurred, but they still do not constitute, they don't rise to the level of the judge's legal determination that that constituted a reasonable suspicion. He did talk about nervousness. This court has said over and over, nervousness is not a good indicator of criminal activity. But he noticed that nervousness after he had him out of the vehicle at 3 o'clock in the morning, standing behind his car when he wasn't pursuing the purposes of the stop for 25 minutes. Who wouldn't be nervous in that particular circumstance? I don't believe there was a reasonable suspicion, and I would just rely on the arguments submitted in my brief. Thank you. Thank you, Mr. Yost. Mr. Yost, I note that you're court-appointed. I want to thank you for taking on this appeal, which you've ably presented, and the government also, Ms. Harreld, was ably represented here this morning. Thank you both for being here. That wraps up our term for the week. I'd ask the clerk to adjourn. Court, we'll come down and greet you and adjourn for the week.
judges: Albert Diaz, Toby J. Heytens, DeAndrea Gist Benjamin